**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN DOE,<br><br>       Plaintiff,<br><br>      v.<br><br>KROLL RESTRUCTURING<br>ADMINISTRATION LLC,<br><br>       Defendant. | Case No. 1:26-cv-2363<br><br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

**TABLE OF CONTENTS**

<b>Page</b>

I.    BACKGROUND AND NATURE OF THE ACTION ..................................................... 1

II.   SUMMARY OF PLAINTIFF'S CLAIMS ............................................................... 8

    A.    Bases of Kroll's Liability ................................................................ 8

    B.    Causation and Damages ................................................................ 11

III.  JURISDICTION AND VENUE ........................................................................ 12

IV.   PARTIES ...................................................................................................... 13

V.    RELEVANT TERMS AND CONCEPTS ......................................................... 13

VI.   ADDITIONAL FACTUAL ALLEGATIONS ..................................................... 15

    A.    The Genesis Bankruptcy Proceedings ................................................ 15

    B.    At the Time of the Kroll Data Breach, SIM Swaps Were a Well-Known and Preventable Breach Strategy. ................................................................ 17

    C.    As a Professed Expert in Cybersecurity with Specialized Knowledge Regarding Crypto-Related Scams, Kroll Was Aware of the Dangers Posed by SIM Swap Scams, Particularly to T-Mobile Customers. ............................... 24

    D.    Through Its Administration of the Genesis Bankruptcy Proceedings, Kroll Was Aware of the Specific Risks Plaintiff Faced Due to Exposure of His Personal Data and the Potential Harm That Could Result. ............................. 27

    E.    The August 2023 SIM Swap Involving a Kroll Employee Resulted in Exposure of the Highly Sensitive Personal and Financial Information Genesis and Its Creditors Had Vigorously Sought to Protect. ............................. 30

    F.    Criminals Used the Information Obtained Through the Kroll Data Breach to Steal Plaintiff's Cryptocurrency Assets. ............................................ 33

CLAIMS FOR RELIEF ......................................................................................... 40

    COUNT I *Breach of Contract (Third-Party Beneficiary)* ............................... 40

    COUNT II *Negligence* ................................................................................ 42

    COUNT III *Gross Negligence* ..................................................................... 44

    COUNT IV *Breach of Fiduciary Duty* ......................................................... 45

PRAYER FOR RELIEF ....................................................................................... 46

JURY TRIAL DEMANDED ................................................................................. 46

Plaintiff John Doe, through his undersigned counsel, brings this action for damages against Defendant Kroll Restructuring Administration LLC ("Kroll").[1]  Plaintiff asserts claims for breach of contract, negligence, gross negligence, and breach of fiduciary duty to recover damages he suffered as a direct and proximate result of Kroll's improper actions (or inaction) in serving as the court-appointed claims and noticing agent for the bankruptcy proceedings involving Genesis Global Holdco, LLC ("Genesis"), *In re Genesis Global Holdco, LLC, et al.*, No. 23-10063 (SHL) (Bankr. S.D.N.Y.) ("*In re Genesis*" or "Genesis Bankruptcy Proceedings").

Plaintiff's allegations are based on personal knowledge as to his actions and otherwise on information and belief, including based on the investigation conducted by and through his attorneys, which is ongoing.  Plaintiff believes substantial additional evidentiary support for his allegations would be uncovered through a reasonable opportunity for discovery.[2]

## I.    BACKGROUND AND NATURE OF THE ACTION

1.    Imagine being an early cryptocurrency investor who recognized the potential of these innovative assets to change the market and who translated that market savvy into cryptocurrency investments worth hundreds of millions of dollars, only to then see that wealth

---

[1] In light of the serious financial harm Plaintiff has suffered due to the unlawful exposure of his highly sensitive personal and financial information, as well as his continued exposure to potential additional harm, it is appropriate to use a pseudonym to reference Plaintiff in this publicly filed complaint, as further explained in Plaintiff's motion to proceed under a pseudonym submitted herewith. *See, e.g.*, *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189 (2d Cir. 2008) (establishing "the standard governing the use of pseudonyms in civil litigation in our Circuit"); *Doe v. DNA Diagnostics Ctr. LLC*, 2025 WL 1725449, at *1 (S.D.N.Y. June 18, 2025) (allowing plaintiff to proceed pseudonymously).

[2] Unless otherwise indicated, all emphasis in this Complaint has been added, and all internal citations, quotation marks, and footnotes have been omitted.  Additionally, citations to pages of court filings refer to the CM/ECF pagination.

disappear in a flash due to the actions of third parties beyond your control. What some might imagine merely as a nebulous nightmare is now Plaintiff's stark reality.

2. Plaintiff began investing in cryptocurrency in 2011. Among the platforms he used for cryptocurrency investing was Genesis—specifically, Genesis Global Capital, LLC ("GGC"), which "provides lending and borrowing services for digital assets and fiat currency primarily to and from institutional and high net worth individual customers."[3]

3. In January 2023, Genesis filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code. In commencing those proceedings, Genesis attributed its financial hardship to "tremendous dislocation" in the digital asset industry over the preceding few months.[4] Among other seminal events, in November 2022 FTX Trading Ltd. and Alameda Research Ltd. (along with certain affiliates)—companies run by the now-incarcerated former CEO Sam Bankman-Fried—filed for bankruptcy protection. As those entities' difficulties unfolded, Genesis "experienced unprecedented withdrawals, leading GGC . . . to pause all lending and borrowing on November 16, 2022."[5] In their bankruptcy filings, the Genesis debtors reported they had more than 100,000 creditors and as much as $10 billion in liabilities.[6]

4. GGC identified Plaintiff as a creditor and identified his claim as encompassing holdings in Bitcoin Cash (BCH), Bitcoin (BTC), Gemini Dollar (GUSD), and USD. Those assets had a total market value in January 2023 of hundreds of millions of dollars, a figure that would have increased significantly as the market price of those assets has increased over the past several years.

---

[3] Decl. of A. Derar Islim in Supp. of First Day Mots. & Applications in Compliance with L.R. 1007-2, *In re Genesis*, Dkt. 17, ¶ 9.

[4] *Id.* ¶ 28.

[5] *Id.* ¶ 30.

[6] *See In re Genesis Global Capital, LLC*, No. 23-10064 (Bankr. S.D.N.Y.), Dkt. 3.

5.    While Genesis's financial collapse caused Plaintiff and other investors to lose a portion of the assets they invested through Genesis, what happened after Genesis hired Kroll to administer the bankruptcy exposed those investors—and Plaintiff in particular—to once-unthinkable financial harm.

6.    A disturbing byproduct of the explosion of cryptocurrency and related assets in the market is the increasing prevalence of scams and other unlawful activity directed at cryptocurrency investors.  The United States Department of the Treasury noted in a September 2022 report that "[a]s the crypto-asset market has grown, so has the volume of fraud, scams, and theft in the ecosystem."[7]  The agency reported that "[o]f the $14 billion in crypto-asset-based crime in 2021, theft rose by over 500% year-over-year to $3.2 billion in total," and thefts include "security breaches that target individuals' private keys, which can be obtained through phishing, key logging, or social engineering, code exploits, and flash loan attacks."[8]

7.    "SIM swapping" is one common type of scam.  As further detailed in Section VI.B below, it is a method employed by cybercriminals to gain unauthorized access to an individual's mobile phone number and, in turn, to the sensitive accounts and data on that mobile phone. Specifically, it involves "convincing a mobile carrier to transfer the victim's phone number to a SIM [Subscriber Identity Module] card under the attacker's control, thereby providing the attacker with the ability to intercept SMS-based two-factor authentication codes and reset passwords."[9] While SIM swapping has occurred for decades, "[i]ts usage has expanded from simply gaining

---

[7] U.S. DEP'T OF THE TREASURY, *Crypto-Assets: Implications for Consumers, Investors, and Businesses*, at 26 (Sept. 2022), https://home.treasury.gov/system/files/136/CryptoAsset_EO5.pdf.
[8] *Id.* at 28.
[9] *See What is SIM Swapping?*, SENTINELONE, https://www.sentinelone.com/cybersecurity-101/threat-intelligence/what-is-sim-swapping/ (last visited on Mar. 12, 2026).

unauthorized access to email or social media accounts to infiltrating cryptocurrency wallets, where attackers can steal vast sums of digital currency."[10]

8.    The rise in cyber-theft has coincided with a sharp increase in data breaches.  A January 2024 report issued by the non-profit Identify Theft Resource Center noted that in 2023, "[t]he number of data compromises reported in the United States surpassed two significant milestones": "the highest number of data events reported in a single year and exceeding 2,000 (and ultimately 3,000) events in a single year."[11]   The 3,205 "data breaches, exposures, leaks and unspecified events" that year represented a 78% increase over the previous year and a 72% increase from the previous all-time high of 1,860 set in 2021.[12]

9.    One of those 3,205 incidents involved Kroll, which among other things served as claims and noticing agent for the Genesis Bankruptcy Proceedings.  In August 2023, Kroll disclosed in an email to 717 Genesis creditors that it had experienced "a third-party security incident that may have impacted" their "personal data submitted in connection with the claims process" (the "Kroll Data Breach").[13]  It specified that on August 19, 2023, "an attacker conducted a SIM swapping attack against T-Mobile US and gained control of a mobile phone number belonging to an employee of Kroll Restructuring Administration LLC" and "[a]s a result, the attacker appears to have accessed files stored online in Kroll's cloud-based systems, including files

---

[10] *Id.*

[11] IDENTITY THEFT RESOURCE CENTER, *2023 Data Breach Report*, at 6 (Jan. 2024), https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf.

[12] *Id.*

[13] *In re Genesis*, Dkt. 620.

that may have contained information about you, such as your name, address, email address, and your claim(s) against the Genesis Debtors."[14]

10.    As an organization consisting of self-described "leading industry professionals with significant experience in both the legal and administrative aspects of large, complex chapter 11 cases," Kroll is acutely aware of the importance of data security.[15]  On its website the Company highlights that its "advanced technology—leveraging the latest database architecture, software development languages and website frameworks—sets us apart from our competitors," and that it has "built the most secure, accurate, reliable, and efficient technology platforms to deliver the highest quality outcomes."[16]  Kroll adds: "For this reason, clients choose us when millions of dollars and reputations are on the line."[17]

11.    Indeed, as a company that also provides cybersecurity services, Kroll knows more than most about the perils of failing to implement and maintain adequate systems, procedures, and practices for securing data, as well as the particular threats posed by scams such as SIM swapping. In marketing its "end-to-end" Cyber and Data Resilience Services, for example, Kroll represents that it "merges elite security and data risk expertise with frontline intelligence from thousands of incident response, regulatory compliance, financial crime and due diligence engagements to make [its] clients more cyber resilient."[18]  Recognizing that "[o]rganizations across the globe are navigating recurring and fluctuating risks to their cybersecurity posture and critical data,"

---

[14] *Id.*

[15] *In re Genesis*, Dkt. 72.

[16] *See Restructuring Administration*, KROLL, https://www.kroll.com/en/services/restructuring-administration (last visited on Mar. 12, 2026).

[17] *Id.*

[18] *See Cyber and Data Resilience*, KROLL, https://www.kroll.com/en/services/cyber (last visited on Mar. 12, 2026).

including "persistent cyberattacks," Kroll notes "there need to be sustainable processes in place to continuously anticipate, withstand, and recover from these adverse conditions."[19]

12.    Kroll also specifically identifies the use of "Mobile Devices as an Attack Vector":

To you, your network of mobile devices is a critical business asset.  To a cybercriminal, it's a source of valuable data and a potential point of access to your financial, cloud, and business assets and intellectual property.  From smishing to malware to malicious apps, the security risks associated with smartphones and other mobile devices are significant.  The rise in recent years of remote and hybrid working has further increased this challenge for organizations, combined with bring your own device (BYOD) and security corporate mobile inventories.[20]

13.    In fact, Kroll specifically identifies SIM swapping as one of "the most commonly used approaches" by "threat actors tak[ing] advantage of mobile devices."[21]

14.    Further, in touting its "unrivaled expertise in cyber risk management" and its "frontline insights acquired by handling more than 1,000 cyber incidents per year," Kroll advises potential clients that "[w]hen an incident affects your customers, it won't matter if the source was a third party—your organization will be held accountable for the harm."[22]  Through this action, Plaintiff seeks to hold Kroll to its own standard.

15.    Contrary to proper practices for a business whose services require the handling of sensitive personal data—as Kroll did in connection with the Genesis Bankruptcy Proceedings—Kroll failed to implement or maintain well-known, appropriate safeguards against cyber-threats, which allowed the Kroll Data Breach to occur.

---

[19] *Id.*

[20] *See Mobile Device Forensics*, KROLL, https://www.kroll.com/en/services/cyber/incident-response-recovery/mobile-forensics (last visited on Mar. 12, 2026).

[21] *Id.*

[22] *See Optimized Third-Party Cyber Risk Management Programs*, KROLL, https://www.kroll.com/en/services/cyber/cyber-risk-assessments/third-party-cyber-risk-management (last visited on Mar. 12, 2026).

16.     Indeed, following the data breach, one leading cybersecurity expert aptly observed that Kroll holds itself out as "employ[ing] elite cyber risk leaders uniquely positioned to deliver end-to-end cyber security services worldwide," and yet "[a]pparently, these elite cyber risk leaders did not consider the increased attack surface presented by their employees using T-Mobile for wireless service."[23]  Additionally, based on its post-breach public statements detailed below, Kroll allowed its internal systems—including the data it received in connection with the Genesis Bankruptcy Proceedings—to be accessible through its employees' personal phones.  Doing so rendered that data susceptible to unauthorized access through exactly the type of SIM swap attack that occurred in August 2023.  These and other deficiencies in Kroll's infrastructure and handling of customers' data fell far below best practices in the industry and reflect a blatant disregard for Kroll's contractually assumed and common law duties, as well as Plaintiff's interests.

17.     The exposure of Plaintiff's data directly enabled a well-orchestrated scam based on social engineering tactics perpetrated by criminals who have since been indicted for, and in several instances pled guilty to, stealing hundreds of millions of dollars' worth of cryptocurrency from Plaintiff (the "Social Engineering Attack").  As further detailed in Section VI.F below, using highly sophisticated techniques that were possible only because they had obtained key information about Plaintiff as a result of the Kroll Data Breach, those malefactors deceived Plaintiff into providing them access to accounts from which they stole his cryptocurrency.

18.     Kroll already has paid millions of dollars for damages caused by the Kroll Data Breach.  On August 29, 2024, Kroll entered into a settlement agreement with FTX entities (collectively referred to as the "FTX Group"), for which Kroll served as claims and noticing agent

---

[23] *Kroll Employee SIM Swapped for Crypto Investor Data*, KREBS ON SECURITY (Aug. 25, 2023), https://krebsonsecurity.com/2023/08/kroll-employee-sim-swapped-for-crypto-investor-data/ (last visited on Mar. 12, 2026).

in bankruptcy proceedings.  Following the Kroll Data Breach, the FTX Group asserted losses of more than $3.3 million through March 31, 2024 (the "Pre-March 31, 2024 Damages") consisting of "professional fees incurred as a direct result of the [Kroll Data Breach], as well as yet-to-be-determined losses, costs and damages incurred by the [FTX] Debtors after March 31, 2024 as a direct result of the [Kroll Data Breach]."[24]  Kroll agreed to pay the full amount of the Pre-March 31, 2024 Damages, but the agreement did not release Kroll from losses arising from, *inter alia*, "[c]laims brought against the FTX Group by customers, regulators, or other third-parties as a result of the [Kroll Data Breach]."[25]  Kroll thus remains liable for losses relating to harm to FTX bankruptcy claimants due to the Kroll Data Breach.  So, too, with respect to the significant harm Kroll has caused to Genesis creditors—perhaps none more so than Plaintiff.

## II.   SUMMARY OF PLAINTIFF'S CLAIMS

### A.   Bases of Kroll's Liability

19.   In failing to implement appropriate safeguards against cyber-threats and allowing the Kroll Data Breach to occur, Kroll is liable to Plaintiff under both contractual and tort principles.

1.   *Breach of Contract*, to the Detriment of Plaintiff as a Third-Party Beneficiary

20.   Shortly after the Genesis debtors filed their bankruptcy petitions in January 2023, Kroll and Genesis entered into an engagement agreement (the "Engagement Agreement") under which Kroll "agree[d] to provide the Company with consulting services regarding legal noticing, claims management and reconciliation, plan solicitation, balloting, disbursements, preparation of schedules of assets and liabilities and statements of financial affairs, communications, confidential

---

[24] *In re FTX Trading Ltd., et al.*, No. 22-11068 (JTD) (Bankr. D. Del.), Dkt. 24885-1, at 2.
[25] *Id.* at 4.

online workspaces or data rooms" as well as "any other services agreed upon by the parties or otherwise required by applicable law, governmental regulations or court rules or orders."[26]

21.    Under the Engagement Agreement, Kroll agreed (subject to specified exceptions not relevant here) "to keep confidential all non-public records, systems, procedures, software and other information received from [Genesis] in connection with the Services provided hereunder."[27] Kroll thus assumed an express contractual obligation to maintain the confidentiality of non-public records and other information it received from Genesis, which included information relating to Plaintiff's claim as a creditor in the Genesis Bankruptcy Proceedings.

22.    In addition to its express obligation to maintain the confidentiality of information relating to Plaintiff and other creditors, Kroll was obligated to maintain and apply systems, procedures, and processes reasonably calculated to preserve the confidentiality of information relating to Plaintiff's bankruptcy claim.  In this regard, the application for authorization to appoint Kroll as claims and noticing agent identified the tasks Kroll would perform, "as well as all quality control relating thereto."[28]  Those tasks included "implement[ing] necessary security measures to ensure the completeness and integrity of the Claims Registers and the safekeeping of the original claims."[29]

23.    Kroll's obligations under the Engagement Agreement to protect the confidential information it collected and used in connection with the Genesis Bankruptcy Proceedings were

---

[26] *In re Genesis*, Dkt. 12, at 28.  The Engagement Agreement defines the "Company" as "Genesis Global Holdco, LLC (together with its affiliates and subsidiaries)," which are specified to include, "to the extent applicable, the Company, as debtor and debtor in possession in any chapter 11 case, together with any affiliated debtors and debtors in possession whose chapter 11 cases are jointly administered with the Company's chapter 11 case." *Id.*

[27] *Id.* at 29.

[28] *In re Genesis*, Dkt. 12, ¶ 14.

[29] *Id.* ¶ 14(k).

intentionally included for the direct benefit of Plaintiff and other Genesis creditors, as it was their confidential information that Kroll agreed to collect, store, and protect.  The benefits of collection and protection of Plaintiff's information were thus the direct and primary objective of the contracting parties Kroll and Genesis, such that Plaintiff is an intended third-party beneficiary of the Engagement Agreement and therefore entitled to enforce it.

24.    As further detailed in Section VI.A below, Kroll breached the Engagement Agreement by failing to maintain and apply security measures reasonably calculated to preserve the confidentiality of information relating to Plaintiff's bankruptcy claim, and by allowing the August 2023 Kroll Data Breach to occur.

2.    *Negligence* and *Gross Negligence*

25.    Independent of its contractual obligations under the Engagement Agreement, Kroll had a legal duty to Plaintiff to protect his highly sensitive personal and financial information against foreseeable unauthorized access and disclosure by implementing and maintaining reasonable and adequate measures to secure, protect, and safeguard Plaintiff's data.

26.    Despite storing highly sensitive information on its platform, Kroll failed to implement and maintain reasonable systems, procedures, and practices to protect Plaintiff's data from unauthorized access and disclosure.  Kroll also failed to reasonably inform Plaintiff after the Kroll Data Breach about the exposure of his data or to provide adequate guidance or assistance to Plaintiff to protect against future personal or financial harm as a result of the data breach.

27.    Indeed, under the extraordinary circumstances giving rise to this action—including Kroll's purported expertise regarding data security and cyber-threats as well as its specific prior knowledge of SIM swapping attacks that posed a direct and immediate danger to Plaintiff and other bankruptcy creditors—Kroll exhibited *gross* negligence.  In that regard, Kroll's behavior manifested a blatant disregard for Plaintiff's rights.

3. *Breach of Fiduciary Duty*

28. In addition to its contractual and non-contractually based duties to Plaintiff that are referenced above, Kroll served as a fiduciary in its capacity as claims and noticing agent for the Genesis Bankruptcy Proceedings. Because Kroll's power to allow or disallow claims and to direct payment by the Genesis debtors was for the benefit of bankruptcy creditors, including Plaintiff, Kroll was subject to a fiduciary duty in exercising that authority.

29. Kroll breached its duty as a fiduciary by failing to implement and maintain reasonable systems, procedures, and practices to protect Plaintiff's data from unauthorized access and disclosure, and by failing to reasonably inform Plaintiff after the Kroll Data Breach about the exposure of his data or to provide adequate guidance or assistance to Plaintiff to protect against future personal or financial harm as a result of the data breach.

**B.    Causation and Damages**

30. The Social Engineering Attack Plaintiff suffered in August 2024 was a direct and proximate result of Kroll's improper actions (or inaction) and the ensuing Kroll Data Breach. Kroll has acknowledged that through the data breach, an unauthorized third party "accessed Kroll's cloud-based systems containing information about certain Genesis claimants" and that "data related to additional Genesis claimants or customers may have been accessed by the unauthorized third party in connection with this incident."[30] Kroll further admits "[t]he files and data that may have been accessed during the incident included personal data" that claimants, their representatives, or Genesis "provided to Kroll in connection with the Genesis bankruptcy proceeding."[31] According to Kroll, the subject information included claimants' e-mail addresses

---

[30] *In re Genesis*, Dkt. 1010, at 4.

[31] *Id.*

-11-

"and may have also included [the claimant's] name, . . . phone number, . . . address, the number or unique identifier of [the claimant's] claim, the amount of [the] claim, information about [the claimant]'s Genesis coin holdings and balances, and/or a copy of [the claimant's] proof of claim form."[32]  In other words, the Kroll Data Breach exposed all of the confidential, highly sensitive information related to Plaintiff's bankruptcy claim that would allow malefactors to target and victimize him—which is exactly what happened.

31.    Plaintiff lost hundreds of millions of dollars' worth of cryptocurrency as a result of Kroll's breaches of the Engagement Agreement as well as its negligence (or gross negligence) and breach of fiduciary duty, which in turn caused the Kroll Data Breach and the Social Engineering Attack.  Ironically and tragically, while Kroll was supposed to assist Plaintiff and other creditors in attempting to *recoup* money they had lost as a result of the Genesis bankruptcy, Kroll has subjected Plaintiff to *additional*—and staggering—financial harm.

## III.    JURISDICTION AND VENUE

32.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because Plaintiff and Kroll are citizens of different states and the amount in controversy exceeds $75,000.

33.    General personal jurisdiction exists over Kroll in this Court because Kroll maintains its headquarters in New York.  Kroll is likewise subject to specific personal jurisdiction in this Court because Kroll maintains operations in the state of New York, Plaintiff's claims arise out of or relate to Kroll's activities conducted in or directed to New York, and exercising jurisdiction comports with constitutional due process principles.

---

[32] *Id.*

-12-

34.     Venue is proper in this District in accordance with 28 U.S.C. § 1391(b).  Kroll is headquartered in this District and many of the acts and practices alleged in this Complaint occurred in substantial part in this District.

## IV.   PARTIES

35.     Plaintiff is a citizen and resident of Arizona.

36.     Kroll is a global firm formed in 2013 that maintains it headquarters at One World Trade Center, 285 Fulton Street, 31st Floor, New York, New York 10007.

## V.    RELEVANT TERMS AND CONCEPTS

37.     To enable a full understanding of Plaintiff's claims, several terms and concepts related to cryptocurrency, the August 2023 Kroll Data Breach, and the August 2024 Social Engineering Attack against Plaintiff warrant further explication.

a)     **Virtual currencies** "are digital representations of value that, like traditional coin and paper money, function as a medium of exchange (i.e., they can be digitally traded or transferred, and can be used for payment or investment purposes)."[33]  **Cryptocurrency** is a type of virtual currency that "rel[ies] on cryptography for security."[34]

b)     **Bitcoin** (BTC) is a type of virtual currency, which—unlike traditional, government-controlled currencies (known as "fiat currencies") such as the U.S. dollar—"is not managed or distributed by a centralized bank or entity."[35]  Bitcoin "can be exchanged for fiat currency, other virtual currencies, products, and services."[36]

---

[33] *United States v. Malone Lam, et al.*, No. 1:24-cr-00417-CKK (D.D.C.) ("*U.S. v. Lam*"), Dkt. 245 (Second Superseding Indictment), ¶ 3.

[34] *Id.*

[35] *Id.* ¶ 2.

[36] *Id.*

c) A **digital wallet** is where cryptocurrency is stored; it "can be online, on [a] computer, or on an external hard drive."[37] A digital wallet has a wallet address, usually consisting of a long string of numbers and letters.[38] As the Federal Trade Commission ("FTC") has noted, "If something happens to your wallet or your cryptocurrency funds—like your online exchange platform goes out of business, you send cryptocurrency to the wrong person, you lose the password to your digital wallet, or your digital wallet is stolen or compromised—you're likely to find that no one can step in to help you recover your funds."[39] Further, unlike fiat currencies, cryptocurrency held in accounts is not insured by a government. Accordingly, "[i]f something happens to your account or cryptocurrency funds—for example, the company that provides storage for your wallet goes out of business or is hacked—the government has no obligation to step in and help get your money back."[40]

d) A **private key** "is a cryptographic key that is uniquely associated with an entity and not made public."[41] Virtual currency addresses "are controlled using a unique corresponding private key, the equivalent of a password, which is needed to access the funds associated with the address," and "[o]nly the holder of an address's private key can authorize a transfer of virtual currency from that address to another address."[42]

---

[37] *What to Know About Cryptocurrency and Scams*, FED. TRADE COMM'N, https://consumer.ftc.gov/articles/what-know-about-cryptocurrency-scams (last visited on Mar. 12, 2026).

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *U.S. v. Lam*, Dkt. 50, ¶ 13.

[42] *Id.*

-14-

e)    **Social engineering** "is a type of fraud scheme wherein individuals call a potential victim and 'socially engineer,' or trick them into providing passwords, pins, and other personal information that the callers use to gain unauthorized access to the victim's private accounts, including cryptocurrency accounts, Google drive files, iCloud accounts, and other valuable personal files."[43]

## VI.    ADDITIONAL FACTUAL ALLEGATIONS

### A.    The Genesis Bankruptcy Proceedings

38.    Kroll and Genesis executed the Engagement Agreement as of January 15, 2023, under which Kroll agreed to perform specified services as claims and noticing agent for the Genesis Bankruptcy Proceedings in accordance with Section 156(c) of the Bankruptcy Code, as reflected in Genesis's application to the court overseeing those proceedings (the "Bankruptcy Court") under Section 156(c) of the Code (the "Section 156(c) Application"). On January 26, 2023, the Bankruptcy Court authorized Kroll's retention as claims and noticing agent, specifying in the order appointing Kroll (the "Appointment Order") that "[n]otwithstanding the terms of the Engagement Agreement attached to the Section 156(c) Application, the Section 156(c) Application is approved solely as set forth in this Order."[44]

39.    The Appointment Order authorized and directed Kroll "to perform noticing services and to receive, maintain, record and otherwise administer the proofs of claim filed in the [Genesis Bankruptcy Proceedings], and all related tasks."[45] The Order further provided that, among other things, Kroll was "designated as the authorized repository for all proofs of claim filed in the

---

[43] *Id.* ¶ 15.

[44] *In re Genesis*, Dkt. 39, ¶ 1. The following month, the Bankruptcy Court entered an order authorizing Kroll to also serve as an administrative advisor. *See In re Genesis*, Dkt. 107.

[45] *In re Genesis*, Dkt. 39, ¶ 2.

[Genesis Bankruptcy Proceedings]" and was "authorized and directed to maintain official claims registers for each of the Debtors."[46] Kroll was also "authorized to take such other action to comply with all duties set forth in the Section 156(c) Application."[47]

40.     Under the Engagement Agreement, which was filed with the Section 156(c) Application and referenced in the Appointment Order, Kroll (subject to exceptions not relevant here) "agree[d] to keep confidential all non-public records, systems, procedures, software and other information received from [Genesis] in connection with the Services provided hereunder."[48] Among its fees contemplated by the Engagement Agreement, Kroll stated it would charge $0.10 per record per month for "[d]ata storage, maintenance and security."[49] Further, as noted earlier, the Section 156(c) Application specified that Kroll would, among other things, "implement necessary security measures to ensure the completeness and integrity of the Claims Registers and the safekeeping of the original claims."[50]

41.     By order of April 4, 2023, the Bankruptcy Court established a general deadline of May 22, 2023 for any person or entity to submit a proof of claim that arose prior to January 19, 2023 (the date the Genesis Bankruptcy Proceedings were commenced) against debtors Genesis Global Holdco, LLC; Genesis Global Capital, LLC; or Genesis Asia Pacific Pte. Ltd.  The order further provided, however, that a claimant "d[id] **not** need to file a Proof of Claim on behalf of a claim on or prior to the applicable Bar Date if the claim" consisted of (among others):

> any Prepetition Claim listed in the Debtors' Schedules (as defined herein), *and* is not designated as "disputed," "contingent," and/or "unliquidated," *and* with respect

---

[46] *Id.* ¶ 3.

[47] *Id.* ¶ 5.

[48] *In re Genesis*, Dkt. 12, ¶ 4(a).

[49] *Id*. at 37.

[50] *Id.* ¶ 14(k).

to which the Entity asserting such Prepetition Claim agrees with the nature, classification, and amount that such Prepetition Claim is identified in the Schedules, *and* with respect to which the Entity asserting such Prepetition Claim agrees that its Prepetition Claim is an obligation only of the specific Debtor who has listed the Prepetition Claim in its Schedules[.][51]

42.    The claim form Plaintiff received stated "Debtor Genesis Global Capital, LLC has listed [Plaintiff's] claim on Schedule E/F, Part 2 as a General Unsecured claim for" BCH, BTC, GUSD, and USD in amounts specified in the claim form.[52]   The form further stated, "If you agree with the claim amount and characterization, you do not need to submit this claim form."   Because Plaintiff agreed with the claim amount and characterization specified on the claim form, he did not submit a claim form.

43.    In its capacity as claims and noticing agent, Kroll received, and agreed to keep secure and confidential, non-public, highly sensitive personal and financial information relating to Plaintiff that Genesis had maintained in its records, including Plaintiff's name and address as well as the types and amounts of cryptocurrency assets that were the subject of Plaintiff's bankruptcy claim.   Kroll had access to and used Plaintiff's sensitive personal and financial information to administer Plaintiff's claim and perform related services.

> **B.    At the Time of the Kroll Data Breach, SIM Swaps Were a Well-Known and Preventable Breach Strategy.**

44.    A common method cybercriminals use to commit fraud is to gain control of the privileged information system accounts of those who administer and control secret financial

---

[51] *In re Genesis*, Dkt. 200, at 5 (bold and italics in original).   The order notes "the term 'entity' has the meaning given to it in section 101(15) of the Bankruptcy Code." *Id.* at 2.   Section 101(15) defines "entity" to include "person, estate, trust, governmental unit, and United States trustee." 11 U.S.C. § 101(15).   Additionally, Section 101(41) defines "person" to include "individual, partnership, and corporation."   11 U.S.C. § 101(41).

[52] Based on the claim amount, Plaintiff understands he is the creditor described at a particular line of Schedule F.

information, such as bankers, brokers, accountants, claims agents, and others in the financial sector who hold information that can be used to further perpetrate an asset theft. These privileged information system accounts are typically secured using (at least) a username that identifies the account user, a secret password known only to that person, and a second factor of authentication (called two-factor authentication (2FA) or multi-factor authentication (MFA)), which proves that the person logging into the financial information system account holds or possesses some physical object, such as a specific cellular phone.

45. Cellular phones use SIMs, which are a form of secure memory chip, to uniquely identify every phone system subscriber to the carrier when they use the system. Thus, the "identity" (phone number) of a phone is bound to a SIM chip, not to the hardware phone itself. Further, the binding of the phone number to the SIM identity is performed by the carrier (such as T-Mobile) as a configuration action, and a phone number account can be bound to any SIM by a T-Mobile customer service representative.

46. SIM cards thus facilitate the connection between a mobile device and a mobile network by, among other things, linking a particular device to a user's phone number. Without a working SIM and an effective SIM connection, a phone typically cannot send or receive calls or text messages over a mobile network. SIMs, which may or may not be physically removable from a device, can also store a limited amount of account data—including contacts, text messages, and carrier information—and that data can help identify the subscriber.

47. As a general matter, SIM changes allow customers to keep their mobile network and phone number when they switch devices. While such changes have historically occurred by removing a physical SIM from an old mobile device and placing it in a new one, network carriers like T-Mobile are now able to reassign embedded, electronic SIMs virtually. This means that if,

-18-

for example, a customer purchases a new device, he can associate his mobile account and phone number with that device by working with his network carrier to effectuate the change. For a SIM change to be effective, the network carrier must authenticate the request and process the change.

48.    SIM swaps—also known as SIM hijacking, SIM theft, or "port out scams"—occur when threat actors conduct a SIM change without the victim's permission and obtain control of the victim's phone number as a result.

49.    Threat actors generally obtain such control by convincing the phone owner's network carrier to conduct a SIM change that assigns their phone number to a new device that is actually under the threat actors' control. One method by which threat actors do so is by calling the phone owner's network carrier and pretending to be the intended phone owner—claiming, for instance, that the phone owner's mobile device broke and so his phone number needs to be assigned to a new device.

50.    After hijacking the phone owner's phone number, threat actors often utilize it to gain access to their digital accounts by exploiting two-factor authentication systems that insecurely trust the user's phone. Two-factor authentication links a digital account to not only a username and password, but also to an additional form of identification, which is intended to enhance the account's security. That additional form of identification is often a phone number by which a user receives a code via text message that the user must provide (in addition to his username and password) to log into a digital account. Such accounts sometimes rely on that code alone for the log-in process, forgoing a password entirely, or allow password resets via text message.

51.    Threat actors can exploit two-factor authentication through a SIM swap because they have redirected access to the phone owner's phone number to themselves and thus receive the verification codes required to log into digital accounts, or reset passwords entirely. Once logged

-19-

in, the threat actor can change the password for and obtain complete control of the accounts, which can include e-mail accounts, document storage systems (e.g., Microsoft OneDrive, Dropbox), and financial accounts.

52.     Media outlets began warning of the dangers of SIM swap attacks over a decade ago, and government bodies and academics quickly followed suit.[53]   The Federal Bureau of Investigation ("FBI") specifically warned about SIM swap attacks in early 2022.[54]   Such attacks have been criminally prosecuted since at least 2018.[55]

53.     A widely reported academic study published in 2020 examined the authentication processes of five major mobile carriers in the United States, including T-Mobile, in light of the increasing risk of SIM swap attacks.  The study revealed that 100% of first attempts at SIM swap fraud directed at T-Mobile were successful.[56]

---

[53] *See, e.g.*, Anna Tims, *'Sim swap' gives fraudsters access-all-areas via your mobile phone*, GUARDIAN (Sept. 26, 2015), https://www.theguardian.com/money/2015/sep/26/sim-swap-fraud-mobile-phone-vodafone-customer; Alvaro Puig, *SIM Swap Scams: How to Protect Yourself*, FEDERAL TRADE COMM'N (Oct. 23, 2019), https://consumer.ftc.gov/consumer-alerts/2019/10/sim-swap-scams-how-protect-yourself; Nathanial Popper, *Hackers Hit Twitter C.E.O. Jack Dorsey in a 'SIM Swap.' You're at Risk, Too*, N.Y. TIMES (Sept. 5, 2019), https://www.nytimes.com/2019/09/05/technology/sim-swap-jack-dorsey-hack.html;   Nathanael Andrews, *"Can I Get Your Digits?": Illegal Acquisition of Wireless Phone Numbers for Sim-Swap Attacks and Wireless Provider Liability*, 16 NW. J. OF TECH. AND INTELL. PROP. 79 (2018), https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?params=/context/njtip/article/1311/&path_info=16.2_Andrews.pdf (last visited on Mar. 12, 2026).

[54] *Criminal Increasing SI Swap Schemes to Steal Millions of Dollars from US Public*, FED. BUREAU OF INVESTIGATIONS (Feb. 8, 2022), https://www.ic3.gov/PSA/2022/PSA220208.

[55] Kate Rooney, *Hacker lifts $1 million in cryptocurrency using San Francisco man's phone number, prosecutors say*, CNBC (Nov. 21, 2018), https://www.cnbc.com/2018/11/21/hacker-lifts-1-million-in-cryptocurrency-using-mans-phone-number.html.

[56] Kevin Lee, Ben Kaiser, Jonathan Mayer, Arvind Narayanan, Center for Information Technology Policy, Princeton University, *An Empirical Study of Wireless Carrier Authentication for SIM Swaps* (Aug. 2020), https://www.usenix.org/system/files/soups2020-lee.pdf; *see also In the Matter of Protecting Consumers from SIM Swap and Port-Out Fraud*, FCC 21-102, Notice of Proposed Rulemaking, FED. COMM. COMM'N (Sept. 30, 2021), https://docs.fcc.gov/public/attachments/FCC-21-102A1.pdf;   Catalin Cimpanu, *Academic*

-20-

54.     Although there is no central authority that tracks the frequency of SIM swap attacks nationwide and mobile carriers do not generally publish such statistics, evidence suggests the attacks have become common.[57]

55.     The FBI has received complaints of these attacks since at least 2018.  Between January 2018 and December 2020, the FBI received 320 such complaints.[58]  That number jumped to more than 1,611 in 2021 and 2,026 in 2022.[59]  In 2023, there were 1,075 complaints.[60]

56.     The Federal Communications Commission ("FCC") has also documented the increase in SIM swap attacks.  According to a staff review of informal complaints submitted through the agency's Consumer Complaint Center, in 2020 the Commission received approximately 300 complaints concerning SIM swap or port-out-fraud; the number jumped to 400 in 2021 and 500 in 2022.[61]

57.     Additionally, criminal indictments and civil ligation have followed the increased frequency of consumer complaints regarding SIM swap attacks.[62]

---

research finds five US telcos vulnerable to SIM swapping attacks, ZDNEt (Jan. 11, 2020), https://www.zdnet.com/article/academic-research-finds-five-us-telcos-vulnerable-to-sim-swapping-attacks/.

[57] See generally Kennedy Meda, A deep dive into the growing threat of SIM swap fraud, THOMSON REUTERS (Aug. 18, 2025), https://www.thomsonreuters.com/en-us/posts/corporates/sim-swap-fraud/.

[58] Criminal Increasing SI Swap Schemes to Steal Millions of Dollars from US Public, FED. BUREAU OF INVESTIGATIONS (Feb. 8, 2022), https://www.ic3.gov/PSA/2022/PSA220208.

[59] Id.

[60] FED. BUREAU OF INVESTIGATION, Internet Crime Report 2023, at 20 https://www.ic3.gov/AnnualReport/Reports/2023_IC3Report.pdf.

[61] In the Matter of Protecting Consumers from SIM Swap and Port-Out Fraud, FCC 23-95, Report and Order and Further Notice of Propose Rulemaking, FED. COMM. COMM'N, 4 n.13 (Nov. 15, 2023), https://docs.fcc.gov/public/attachments/FCC-23-95A1.pdf.

[62] See, e.g., Office of the U.S. Attorneys, Eastern District of Michigan, Nine Individuals Connected to a Hacking Group Charged With Online Identity Theft and Other Related Charges, U.S. DEP'T OF JUSTICE (May 9, 2019), https://www.justice.gov/usao-edmi/pr/nine-individuals-connected-

58. Despite their frequency, SIM swap attacks are preventable through a variety of simple precautions that have been widely known and reported on since at least 2019. Individuals and businesses can avoid such attacks by, among other things, requiring the use of authenticator applications for one-time passcodes, using physical security keys to facilitate multi-factor authentication, or establishing a secondary system to confirm SIM swap requests.[63]

59. In November 2020, for example, Microsoft strongly urged users to stop using telephone-based two-factor authentications such as text messages due to known vulnerabilities in telephone networks, and instead encouraged the use of authenticator applications and security

---

hacking-group-charged-online-identity-theft-and-other; Office of the U.S. Attorneys, District of Maryland, *Two Men Facing Federal Indictment in Maryland for Scheme to Steal Digital Currency and Social Media Accounts Through Phishing and "Sim-Swapping,"* U.S. DEP'T OF JUSTICE (Oct. 28, 2020), https://www.justice.gov/usao-md/pr/two-men-facing-federal-indictment-maryland-scheme-steal-digital-currency-and-social-media; Office of the U.S. Attorneys, Western District of Texas, *San Antonio Pair Plead Guilty to SIM Swap Scheme*, U.S. DEP'T OF JUSTICE (Oct. 12, 2022), https://www.justice.gov/usao-wdtx/pr/san-antonio-pair-plead-guilty-sim-swap-scheme; Office of the U.S. Attorneys, Eastern District of Louisiana, *California Resident Pleads Guilty for His Role in Sim Swap Scam Targeting at Least 40 People, Including New Orleans Resident*, U.S. DEP'T OF JUSTICE (May 18, 2022), https://www.justice.gov/usao-edla/pr/california-resident-pleads-guilty-his-role-sim-swap-scam-targeting-least-40-people; Lorenzo Franceschi-Bicchierai, *Hacker Who Stole $5 Million By SIM Swapping Gets 10 Years in Prison*, VICE (Feb. 1, 2019), https://www.vice.com/en/article/hacker-joel-ortiz-sim-swapping-10-years-in-prison/; Gertrude Chavez-Dreyfuss, *U.S. Investor Sues AT&T for $224 million over loss of cryptocurrency*, REUTERS (Aug. 15, 2018), https://www.reuters.com/article/us-cryptocurrency-at-t-lawsuit/u-s-investor-sues-att-for-224-million-over-loss-ofcryptocurrency-idUSKBN1L01AA; Christopher Brown, *AT&T Must Face Bitcoin Mining Investor's Suit Over SIM-Card Swap*, BLOOMBERG (Dec. 14, 2022), https://news.bloomberglaw.com/litigation/at-t-must-face-bitcoin-mining-investors-suit-over-sim-card-swap.

[63] *See, e.g.*, Andy Greenberg, *The SIM Swap Fix That the US Isn't Using*, WIRED (Apr. 26, 2019), https://www.wired.com/story/sim-swap-fix-carriers-banks/; Alvaro Puig, *SIM Swap Scams: How to Protect Yourself*, FED. TRADE COMM'N (Oct. 23, 2019), https://consumer.ftc.gov/consumer-alerts/2019/10/sim-swap-scams-how-protect-yourself; Shane Hickey, *Sim-swap fraud is on the rise. How can you stop if happening to you?*, GUARDIAN (Sept. 13, 2020), https://www.theguardian.com/money/2020/sep/13/sim-swap-is-on-the-rise-how-can-you-stop-it-happening-to-you.

keys.[64]    At the time, Microsoft's Director of Identity Security described telephone-based authentication techniques as "the least secure of the [multi-factor authentication] methods available today."[65]  Kroll knew about the insecurity of telephone-based 2FA and the problem of 2FA bypass attacks based on SIM swapping, and published specific guidance for its customers in May 2022 that warned about the problem and how to resolve it.[66]  Yet, Kroll continued to leave its own information systems configured to allow telephone-based 2FA.

60.    Although threat actors have targeted victims at nearly all mobile carriers by means of SIM swap attacks, at the time of the Kroll Data Breach it was well known that T-Mobile customers were particularly susceptible.  According to a report based on an extensive analysis of chat logs and published in February 2023—approximately six months before the Kroll Data Breach—cybercriminal groups claimed access to internal networks at T-Mobile in more than 100 separate incidents during an eight-month period in 2022.  During each of those incidents, cybercriminals gained access to T-Mobile internal company tools and could then use that access to divert *any* T-Mobile customer's text messages and phone calls to another device.[67]  The report

---

[64] Alex Weinert, *It's Time to Hang Up on Phone Transports for Authentication*, MICROSOFT (Nov. 10, 2020), https://techcommunity.microsoft.com/blog/microsoft-entra-blog/its-time-to-hang-up-on-phone-transports-for-authentication/1751752; Catalin Cimpanu, *Microsoft urges users to stop using call & SMS-based multi-factor authentication*, ZDNET (Nov. 11, 2020), https://www.zdnet.com/article/microsoft-urges-users-to-stop-using-phone-based-multi-factor-authentication/.

[65] Alex Weinert, *It's Time to Hang Up on Phone Transports for Authentication*, MICROSOFT (Nov. 10, 2020), https://techcommunity.microsoft.com/blog/microsoft-entra-blog/its-time-to-hang-up-on-phone-transports-for-authentication/1751752.

[66] *See* David Wagner, Joshua Karanouh-Schler, *MFA Prompt Bombing No More: Countering MFA Bypass Tactics*, KROLL (MAY 23, 2022), https://www.kroll.com/en/publications/cyber/mfa-prompt-bombing-no-more (last visited on Mar. 12, 2026).

[67] *Hackers Claim They Breached T-Mobile More Than 100 Times in 2022*, KREBS ON SECURITY (Feb. 28, 3023), https://krebsonsecurity.com/2023/02/hackers-claim-they-breached-t-mobile-more-than-100-times-in-2022/.

further observed that while cybercriminals offered access to other mobile carriers' systems (e.g., AT&T, Verizon) to facilitate SIM swap attacks, those solicitations "appear[ed] far less frequently" than offers of SIM swap attacks on T-Mobile customers.[68]

61. T-Mobile's vulnerability to SIM swap attacks was also well-documented in publicly reported accounts, including instances where victims followed the entirety of T-Mobile's security advice.[69] Some of those accounts came to light through civil litigation in which victims sought to recover significant cryptocurrency assets that were allegedly stolen due to SIM swap attacks on their T-Mobile phone numbers.[70]

### C. As a Professed Expert in Cybersecurity with Specialized Knowledge Regarding Crypto-Related Scams, Kroll Was Aware of the Dangers Posed by SIM Swap Scams, Particularly to T-Mobile Customers.

62. Kroll describes its business as "help[ing] clients detect, manage and mitigate enterprise risk and make strategic and informed financial decisions to achieve an enduring competitive advantage."[71] Among the tasks for which Kroll promotes itself as a "trusted partner"

---

[68] *Id.*

[69] Daniel Golightly, *T-Mobile SIM Swap Used to Steal Instagram Credentials*, ANDROID HEADLINES (May 21, 2018), https://www.androidheadlines.com/2018/05/t-mobile-sim-swap-used-to-steal-instagram-credentials.html; Sergiu Gatlan, *T-Mobile discloses data breach after SIM swapping attacks*, BLEEPING COMPUTER (Feb. 26, 2021), https://www.bleepingcomputer.com/news/security/t-mobile-discloses-data-breach-after-sim-swapping-attacks/.

[70] Paddy Baker, *Veritaseum Accuses T-Mobile of Gross Negligence Over $8.6M SIM-Swap Hack*, COINDESK (July 23, 2020), https://finance.yahoo.com/news/veritaseum-accuses-t-mobile-gross-121517376.html?guccounter=1; Jeff Stone, *SIM swapping victim alleges T-Mobile failed to stop $20,000 cryptocurrency scam*, CYBERSCOOP (June 4, 2021), https://cyberscoop.com/sim-swapping-tmobile-coinbase-cryptocurrency/; Steve Kaaru, *BTC investor sues T-Mobile over alleged SIM swap fraud*, COINGEEK (July 20, 2021), https://coingeek.com/btc-investor-sues-t-mobile-over-alleged-sim-swap-fraud/; Arnab Shome, *Crypto Theft Victim Sues T-Mobile for Allowing SIM-Swap Attack*, FINANCE MAGNATES (Dec. 2, 2021), https://www.financemagnates.com/cryptocurrency/news/crypto-theft-victim-sues-t-mobile-for-allowing-sim-swap-attack/.

[71] *See About Us*, KROLL, https://www.kroll.com/en/about-us (last visited on Mar. 12, 2026).

-24-

to its client base are "securing critical assets, honing regulatory compliance practices or optimizing your cyber infrastructure."[72]   Kroll also represents that it provides "reactive, advisory, transformation and managed security services to support clients at every stage of their path toward cyber and data resilience maturity."[73]

63.   Kroll further describes itself as not only "the largest global incident response provider" with respect to cybersecurity,[74] but also as an expert in "vulnerability management."[75] The company highlights "SIM swapping" as among the "most commonly used approaches" that "threat actors" use to "take advantage of mobile devices."[76]

64.   In marketing its "end-to-end restructuring administration services," which include administering bankruptcies, claims administration, and other related tasks, Kroll states its "advanced technology—leveraging the latest database architecture, software development languages and website frameworks—sets [it] apart from [its] competitors."[77]   Kroll also claims it has "built the most secure, accurate, reliable, and efficient technology platforms to deliver the highest quality outcomes."[78]

---

[72] *Risk Advisory*, KROLL, https://www.kroll.com/en/services/risk-advisory (last visited on Mar. 12, 2026).

[73] *Cyber and Data Resilience*, KROLL https://www.kroll.com/en/services/cyber (last visited on Mar. 16, 2026).

[74] *Incident Response & Recovery*, KROLL, https://www.kroll.com/en/services/cyber/incident-response-recovery (last visited on Mar. 12, 2026).

[75] *Threat Exposure* Management, KROLL, https://www.kroll.com/en/services/cyber/threat-exposure-management (last visited on Mar. 12, 2026).

[76] *Mobile Device Forensics*, KROLL, https://www.kroll.com/en/services/cyber/incident-response-recovery/mobile-forensics (last visited on Mar. 12, 2026).

[77] *Restructuring Administration*, KROLL, https://www.kroll.com/en/services/restructuring-administration (last visited on Mar. 16, 2026).

[78] *Id.*

65.    As a professed expert in cybersecurity, Kroll knew or should have been aware of the threats posed by SIM swap attacks, including that T-Mobile in particular was vulnerable to them.

66.    Indeed, in November 2019 Kroll's Cyber Risk Director published an article on *Dark Reading*, an online publication for cybersecurity professionals, focused on the threat of SIM swaps.[79]  The author described herself "as a director at a cyber-risk investigations company and a former FBI cyber analyst . . . very familiar with SIM-swapping threats."[80]  She also noted "[t]he false sense of security encouraged by the SMS-based authentication scenario leaves users vulnerable to SIM-swapping attacks and privacy vulnerabilities," and recommended a number of steps to secure online accounts.[81]

67.    That same senior Kroll employee published another article in January 2020 titled *Mechanics of a Crypto Heist: How SIM Swappers Can Steal Cryptocurrency*, which addressed the risks SIM swap attacks posed to cryptocurrency assets and noted "SIM-swap attacks on cryptocurrency exchanges escalated in 2019."[82]

68.    Additionally, in its December 2019 newsletter, Kroll noted the potential of SIM swaps to result in losing control of personal e-mail accounts, financial accounts, and cryptocurrency wallets.[83]

---

[79] Nicole Sette, *I 'Hacked' My Accounts Using My Mobile Number: Here's What I Learned*, DARK READING (Nov. 19, 2019), https://www.darkreading.com/endpoint-security/i-hacked-my-accounts-using-my-mobile-number-here-s-what-i-learned.

[80] *Id*.

[81] *Id*.

[82] Nicole Sette, *Mechanics of a Crypto Heist: How SIM Swappers Can Steal Cryptocurrency*, DARK READING (Jan. 2, 2020), https://www.darkreading.com/endpoint-security/mechanics-of-a-crypto-heist-how-sim-swappers-can-steal-cryptocurrency.

[83]    *Season's Greetings from the Dark Web*, KROLL (Dec. 10, 2019), https://www.kroll.com/en/publications/cyber/dark-web-christmas (last visited on Mar. 12, 2026).

69.     Given its professed expertise in cybersecurity and awareness of SIM swap attacks in particular, Kroll understood both the need to appropriately secure Genesis bankruptcy claimants' data and the potential harms they could suffer in the event of a data breach.

**D.     Through Its Administration of the Genesis Bankruptcy Proceedings, Kroll Was Aware of the Specific Risks Plaintiff Faced Due to Exposure of His Personal Data and the Potential Harm That Could Result.**

70.     Beyond its general awareness of cybersecurity risks and the threats posed by SIM swap attacks, including to T-Mobile customers in particular, Kroll was aware of the *specific* risks Plaintiff faced as a Genesis creditor whose highly sensitive personal and financial information was maintained by Genesis and provided to Kroll in its capacity as claims and noticing agent. That information included Plaintiff's name and address as well as the types and amounts of cryptocurrency on which his bankruptcy claim was based.

71.     In recognition of the sensitive nature of information concerning its creditors, Genesis moved for authorization to file such personally identifiable information under seal (the "Sealing Motion"). Specifically, Genesis moved for an order, *inter alia*, (i) "authorizing the Debtors to redact the names, addresses, and contact information of individual creditors . . . listed in," among other things, "the Schedules" that listed bankruptcy claims and "in any other documents filed with the Court"; and (ii) "directing that the redacted information shall remain under seal and confidential, and shall not be made available to any party" other than those specified in the motion.[84] Genesis explained that the subject information "is not generally available on the Internet and could be used to perpetuate identity theft," among other things.[85]

---

[84] *In re Genesis*, Dkt. 67, at 2.
[85] *Id.* at 9.

72.     During an evidentiary hearing on the Sealing Motion, Mark Renzi—Managing Director and Head of the Corporate Finance Financial Institutions Group for Berkeley Research Group, LLC and the financial advisor to a committee of Genesis creditors ("Genesis Creditors Committee")—testified that personal information regarding Genesis creditors was "definitely important to remain confidential in this case because there's a chance for physical threats, physical harm, there's a chance for phishing and there's a chance for psychological harm."[86]  Renzi also explained that there was a "well documented" history of criminals seeking to obtain people's cryptocurrency keys via phishing or other means and that, if the creditors' personal identifying information was exposed, phishing attempts would likely occur, specifically because the creditors were "high net worth investors."[87]

73.     Genesis's counsel similarly emphasized that the data at issue was "not just the name and the contact information," but also "the connection of the name and contact information with a specific claim amount."  Counsel added that, from the size of those claims, "obviously lots of inferences can be made."[88]  In so arguing, counsel drew attention to the sensitivity of that information and the potential risks of publishing it, highlighting that cryptocurrency assets create an increased risk of criminal theft attempts because of the virtually instantaneous and nearly irreversible nature of cryptocurrency transactions.[89]

74.     On August 4, 2023—just weeks before the Kroll Data Breach—the Bankruptcy Court granted Genesis's motion, determining that Genesis had overcome the strong presumption and public policy in favor of public access to court records in light of the evidentiary record, which

---

[86] *In re Genesis*, Dkt. 264, at 20:15-25:9.

[87] *Id*. at 25:6.

[88] *Id*. at 143:19-144:1.

[89] *Id*. 85:7-18.

"demonstrate[d] that an undue risk of identity theft or other unlawful injury exists to [Genesis creditors] should their names, addresses, or other contact information be released in these bankruptcy cases."[90]  The court added that Genesis creditors "are generally understood to be high net worth investors and therefore at heightened risk of financial or physical harm because of their perceived wealth."[91]  Further, the record "reflects that cryptocurrency inherently poses an increased risk of criminal theft attempts because of the near instantaneous and almost irreversible nature of cryptocurrency transactions due to their status as bearer assets."[92]  The court highlighted Mr. Renzi's testimony during which he explained that "because cryptocurrency is a bearer asset, someone obtaining a [creditor's] cryptocurrency keys has control over that cryptocurrency asset," and "it is well documented that criminals will seek to obtain cryptocurrency keys through phishing and other means."[93]

75.    The Bankruptcy Court further noted "the record is replete with examples of past harassments, threats and attacks against individuals motivated by the theft of cryptocurrency."[94] The court cited an FBI public service announcement that warned of the "increasing use of Subscriber Identity Module (SIM) swapping by criminals to steal money from fiat and virtual currency accounts" and "recommended that individuals take precautions to protect against theft, including 'not advertise information about financial assets, including ownership or investment of

---

[90] *In re Genesis*, Dkt. 581, at 30.

[91] *Id.*

[92] *Id.*

[93] *Id.* at 30-31.

[94] *Id.* at 31.

cryptocurrency' and to 'avoid posting personal information online, such as mobile phone number, address, or other personal identifying information.'"[95]

76.    As a result of the Bankruptcy Court's ruling, the publicly filed materials concerning Genesis creditors—including Plaintiff—reflect redactions of personally identifying information, including names and addresses.[96] Thus, the only way Plaintiff's personal and financial information relating to his bankruptcy claim could be exposed was for someone to improperly gain access to it.

> **E.    The August 2023 SIM Swap Involving a Kroll Employee Resulted in Exposure of the Highly Sensitive Personal and Financial Information Genesis and Its Creditors Had Vigorously Sought to Protect.**

77.    On August 25, 2023, Kroll publicly reported that on or around August 19, 2023, "a cyber threat actor targeted a T-Mobile US, Inc. account belonging to a Kroll employee" and "gained access to certain files containing personal information of bankruptcy claimants in the matters of BlockFi, FTX and Genesis."[97] Kroll later specified that the threat actor gained access to "Kroll's M365" system during the attack.[98]

78.    On information and belief, such an attack could only have occurred if the targeted Kroll employee—and the threat actor who impersonated the Kroll employee in connection with the SIM swap attack—was able to access Kroll's internal systems via telephone-based two-factor authentication.  That means of access was set by Kroll; in other words, Kroll could have required

---

[95] *Id.* at 31-32.

[96] *See, e.g.*, *In re Genesis*, Dkt. 146, at 46-52 (Schedule F-1).

[97]    *Security    Incident*,    KROLL    (AUG.    25,    2023), https://web.archive.org/web/20230825182231/https://www.kroll.com/en/about-us/news/security-incident (last visited on Mar. 12, 2026); *see also Kroll's Security Incident Involving Claimant Data/Steps to Protect Yourself*, KROLL, https://genesisquestions.kroll.com/ (last visited on Mar. 12, 2026).

[98] *In re FTX Trading Ltd.*, No. 22-11068 (Bankr. D. Del.), Dkt. 24016-2 (Aug. 29, 2024).

a more secure form of authentication such as a one-time passcode from an authenticator application, or could have required an additional layer of security such as by using a secondary system to confirm account access via a new device or by restricting system-wide access from employees' personal devices, which could have prevented the threat actor from accessing Kroll's internal systems. In fact, *after* the breach, Kroll did just that by requiring "all employee accounts to use a mobile authenticator application as a second factor for authentication."[99]

79. On information and belief, the unauthorized third party accessed Plaintiff's personal information, including information relating to the nature or amount of his Genesis bankruptcy claim, through the Kroll Data Breach. In addition to system-wide precautions to prevent nefarious actors from gaining access to Kroll's internal systems, Kroll could have prevented such access by instituting basic security measures already built into the systems it utilized—including in-use file encryption, file-specific passwords, and restricted access—to protect sensitive datasets stored on Kroll's internal systems, including Genesis claimants' personal and financial information.

80. In disclosing the exposure of Genesis claimants' personal and financial information, Kroll acknowledged that a threat actor "might use this information in a further scam, for example in phishing e-mails to try to trick you into giving up control over your cryptocurrency accounts, wallets, or other digital assets."[100]

81. Indeed, following the Kroll Data Breach, individuals associated with the pending bankruptcies of BlockFi, FTX, and Genesis—all of which involve Kroll as claims and noticing

---

[99] Ltr. from the Official Comm. of Unsecured Creditors of BlockFi Inc. to State Attorneys General re Kroll Security Incident (Jan. 2024), https://dojmt.gov/wp-content/uploads/Consumer-notification-letter-1033.pdf.

[100] *In re Genesis*, Dkt. 620.

agent—reported receiving phishing e-mails.[101]  Many of those communications sought to trick creditors into linking their cryptocurrency assets to an account controlled by threat actors. Creditors reported receiving similar phishing e-mails nearly a year after the data breach.[102]

82.    On information and belief, despite (i) its knowledge of and professed expertise in cybersecurity, including its awareness that SIM swap attacks were common scams and were especially prevalent against T-Mobile customers, (ii) its understanding of the particular risks Plaintiff and other Genesis creditors faced that highly sensitive information relating to their bankruptcy claims could be used for improper purposes, and (iii) its awareness of the actual instances of scam attempts against FTX creditors, for whom Kroll was serving as claims administrator at the same time it served in that role in the Genesis Bankruptcy Proceedings, Kroll failed to take appropriate measures to prevent the August 2023 SIM swap attack involving its employee or to protect Genesis creditors' personal and financial information from a data breach. Further, after the data breach, Kroll failed to adequately inform Plaintiff and other Genesis creditors that their personal and financial information had been exposed, or to help them protect against financial or other harm as a result of the breach.

83.    As indicated above, Kroll's failure to take appropriate measures to prevent the August 2023 SIM swap attack is further evidenced by the steps it took *after* the attack.  According to information sent to BlockFi creditors, Kroll "implemented the following changes to its security measures in light of the [attack]: (i) permanently disabled the employee's compromised account

---

[101] *See* Gabriel Ohalete, *New phishing attacks target FTX, BlockFi & Genesis users after Kroll data leak*, CRYPTOTV (Aug. 27, 2023), https://cryptotvplus.com/2023/08/new-phishing-attacks-target-ftx-blockfi-genesis-users-after-kroll-data-leak/; Shaurya Malwa, *FTX Customers Hit by 'Withdrawal' Phishing Mails After SIM Swap Attack*, COINDESK (Aug. 29, 2023), https://www.coindesk.com/business/2023/08/29/ftx-customers-hit-by-withdrawal-phishing-mails-after-sim-swap-attack.

[102] *See In re Genesis*, Dkt. 1912.

and created a new account for the targeted employee; (ii) required all employee accounts to use a mobile authenticator application as a second factor for authentication; (iii) limited access to all employee accounts to only Kroll-registered computers and mobile devices; (iv) increased the alerting and blocking of suspicious activity on Kroll's instances of online vendor-provided software; and (v) enhanced its password reset procedures."[103]  The remedial measures that Kroll implemented after the breach evidence its previous failure to undertake these standard cybersecurity measures.

### F.    Criminals Used the Information Obtained Through the Kroll Data Breach to Steal Plaintiff's Cryptocurrency Assets.

84.    Kroll's failures caused direct, foreseeable, and enormous financial harm to Plaintiff, who was subjected to a highly sophisticated social engineering scheme perpetrated by members of a criminal enterprise that, on information and belief, targeted him using information obtained through the Kroll Data Breach.

85.    According to a federal indictment, beginning no later than October 2023 and continuing through at least approximately March 2025, a network of criminals "obtained and collected stolen databases primarily relating to virtual currency assets in order to identify potential victims who held vast amounts of virtual currency."[104]  Using those databases, the criminals sought to employ social engineering techniques to steal virtual currency.[105]  On information and belief, those databases included information regarding Plaintiff and his significant Genesis bankruptcy claim.

---

[103] Ltr. from the Official Comm. of Unsecured Creditors of BlockFi Inc. to State Attorneys General re Kroll Security Incident (Jan. 2024), https://dojmt.gov/wp-content/uploads/Consumer-notification-letter-1033.pdf.

[104] *U.S. v. Lam*, Second Superseding Indictment, at 9.

[105] *Id*. at 7-8.

86.     As the Bankruptcy Court recognized, the Genesis data obtained through the Kroll Data Breach was particularly valuable because it identified high-net-worth individuals holding substantial cryptocurrency assets and included their personal details.

87.     As detailed in the federal indictment, the criminals' days-long social engineering attacks would initially target victims by sending "account access" attempt notifications to make victims believe there had been unauthorized attempts to access their online accounts.[106]  The conspirators then called potential victims on the phone and posed as representatives from security or technical support teams at major companies such as Google and Yahoo![107]  One of the co-conspirators, Veer Chetal, served in this role on approximately 50 occasions.[108]

88.     After Chetal or his co-conspirator Jeandiel Serrano convinced victims of their legitimacy via phone, another co-conspirator, Malone Lam, would send the victim an account access request so the criminals could control the victim's device remotely.[109]  Lam would mask those requests so they appeared as if they were originating from the victim's home IP address.[110]

89.     Once the criminals gained remote control of the victim's device, Lam used that control to scour the victim's online accounts for information relating to the victim's financial holdings.[111]  Lam sometimes sent spoofed webpages or "panels" to victims to trick them into

---

[106] *Id.* at 9.

[107] *Id.* at 6; *United States v. Veer Chetal*, No. 24-CR-494 (CKC) (D.D.C.) ("*U.S. v. Chetal*"), Dkt. 8 ("Chetal Plea Statement"), at 5.

[108] Chetal Plea Statement at 5.

[109] *Id.*; *U.S. v. Lam*, Second Superseding Indictment at 9-10.

[110] Chetal Plea Statement at 5.

[111] *Id.* at 5.

loading passwords and other sensitive information into a panel that would transmit the information directly back to Lam.[112]

90.     Using the information gleaned through their chicanery, the criminals then either transferred victim assets themselves, or caused the victims to transfer their virtual currency, into wallet addresses controlled by the criminals.[113]   The criminals then used virtual currency exchanges and professional money launderers to conceal and disguise the origin and ownership of the stolen virtual currency.[114]

91.     In August 2024, the criminals executed this sophisticated and well-practiced social engineering scheme on Plaintiff, identified as "Victim-7" in the Second Superseding Indictment filed in *U.S. v. Lam* and described in the Chetal Plea Statement filed in *U.S. v. Chetal*.   On information and belief, the criminals targeted Plaintiff due to the exposure of his personally identifying information in the breached Kroll database, which informed the criminals that Plaintiff held cryptocurrency assets worth hundreds of millions of dollars and was among Genesis's most significant creditors.[115]

92.     In the days leading up to the theft, Lam caused Google account access verification code notifications to be sent to Plaintiff via text message by attempting to log onto Plaintiff's Google account.  By sending those notifications, Lam was attempting to convince Plaintiff that the next steps in the scheme were legitimate.[116]

---

[112] *Id*. at 7.

[113] *Id*. at 5.

[114] *Id*. at 5.

[115] *In re Genesis*, Dkt. 146, at 46-52 (Schedule F-1).

[116] Chetal Plea Statement at 5.

93.     On or about August 13 or 14, 2024, Plaintiff began receiving calls at his home from an unknown number.  He did not initially answer those calls, but he subsequently searched online for the phone number and learned it was associated with Google.

94.     Based on that information, on Sunday, August 18, 2024, Plaintiff answered the next call from that number at approximately 3:30 pm and spoke to Chetal, who pretended to be a Google representative named "Daniel."  Chetal falsely informed Plaintiff that Google was following up on unauthorized account access attempts.  Chetal told Plaintiff that someone in Paris, France had been attempting to change Plaintiff's Google password and that Plaintiff could be locked out of his Google account as a result.  Chetal also informed Plaintiff of potential safeguards that could secure his Google account.  In an effort to institute such safeguards, Plaintiff gave Chetal access to his Google account by providing Chetal the authentication code that appeared in Plaintiff's two-factor authentication application.[117]

95.     Throughout that initial call, unbeknownst to Plaintiff, Chetal and Lam were communicating and strategizing about ways to gain access to Plaintiff's virtual accounts.  Once the criminals acquired access to Plaintiff's Google account, they searched it for information relevant to his cryptocurrency holdings and obtained additional personal information about him.  Plaintiff was unaware that the criminals conducted those searches.[118]

96.     One of the supposed safeguards Chetal suggested that Plaintiff institute within his Google account was to create a passkey, which would allow password-less sign-in.  Working with Chetal, Plaintiff created such a passkey.  Although Plaintiff did not realize it at the time, the

---

[117] *Id.* at 6.
[118] *Id.*

criminals also gained access to the passkey, which enabled them to independently access Plaintiff's Google account.

97.    While Chetal was purporting to help Plaintiff secure his Google account, the criminals also sent Plaintiff multiple authentication e-mails that appeared to be from Google. Those e-mails gave the impression that Chetal had access to Google's internal systems, thereby lending a further impression of legitimacy to the criminals' conduct.

98.    Chetal also said he could help Plaintiff secure his Microsoft OneCloud account, which is a file-sharing and saving platform. The criminals had already gained access to Plaintiff's OneCloud account because the associated password was saved within Plaintiff's Google password manager. In other words, while Plaintiff believed he was taking precautions to prevent unauthorized access to his Microsoft OneCloud account, the criminals were in fact surreptitiously mining that account for information that would lead them to Plaintiff's cryptocurrency assets.

99.    By searching the files stored on Plaintiff's OneCloud account, the criminals identified an account Plaintiff maintained with Gemini, a different cryptocurrency exchange and custodian bank. After spending approximately two hours on the phone with Plaintiff, Chetal explained that Plaintiff would shortly hear from a Gemini representative because, while the purported issues related to Plaintiff's Google account had been resolved, Gemini had recently learned of malware that could undermine the security of Plaintiff's cryptocurrency assets. Chetal and Plaintiff then ended their call.

100.    Plaintiff soon received a call from Serrano, who pretended to be a Gemini security team representative named "Alexander."[119] Consistent with Chetal's description, Serrano told Plaintiff a malware attack was threatening the security of his Gemini account and, more

---

[119] *Id.*

-37-

specifically, disrupting the usability of his private keys. Serrano further represented that the malware could propagate through cryptocurrency assets stored on Gemini and that, as a result, Plaintiff needed to move his cryptocurrency assets into a different Gemini account. Serrano also indicated that the malware could impact not only the security of Plaintiff's Gemini assets, but also the assets of other Genesis creditors. Based on those representations, Plaintiff provided Serrano with the information necessary to access Plaintiff's Gemini account and watched as his funds moved to a different account, which Serrano informed him would secure the funds from the purported malware attack. Although Plaintiff did not realize it, the criminals had access to that new account.

101. While they transferred those funds, the criminals also searched Plaintiff's Gemini account to identify alternative cryptocurrency assets. Through their search, the criminals located a cryptocurrency account Plaintiff maintained with Genesis; this "withdrawal" account allowed for the immediate transfer of assets out of the Genesis exchange system.

102. Serrano next informed Plaintiff that the malware purportedly affecting his Gemini holdings also threatened the security of his Genesis assets. Believing the security of assets stored on Genesis was at risk, Plaintiff informed Serrano that Plaintiff knew Mark Renzi, the financial advisor to the Genesis Creditor Committee, and wanted to confirm the security threat with him. Plaintiff then hung up with Serrano and called Renzi, who informed Plaintiff that he had not heard of any such security threat but would check with his contacts. Plaintiff did not hear further from Renzi that evening. Afraid of the potential loss of his and other Genesis creditors' assets due to the purported security threat, Plaintiff continued to engage with Serrano.

103. Indeed, while speaking with Renzi, Plaintiff received repeated calls from Serrano and, once Plaintiff ended his call with Renzi, Plaintiff and Serrano resumed their discussion.

-38-

Serrano—continuing to pose as a Gemini representative—again stated to Plaintiff that the aforementioned malware attack threatened the security of Plaintiff's Genesis virtual account. Serrano requested Plaintiff's private key so that Serrano purportedly could log into Plaintiff's Genesis account and secure the assets contained in it.

104.    Given the sizeable assets in his Genesis account, however, Plaintiff was unwilling to provide Serrano with the requested access.  Serrano then informed Plaintiff that he need not provide the entire private key, but rather only its last four characters.  Plaintiff agreed to provide that more-limited information because he did not believe it would allow access to the cryptocurrency assets protected by the private key.  Plaintiff then attempted to provide Serrano with those four characters, but he was unable to do so because of a Bitcoin Core client software update that had previously been implemented.

105.    In light of Plaintiff's inability to access the private key, Serrano proposed an alternative method of verification: that Plaintiff download a software program, AnyDesk, which would allow him to securely transmit this information and provide Serrano with Genesis account access to safeguard Plaintiff's funds.  Plaintiff agreed to attempt this alternative strategy, though he first asked Serrano to confirm that AnyDesk did not contain malware.  Serrano explained that AnyDesk did not contain malware, as evidenced by the fact that it was software available in the public domain.

106.     Relying on this explanation, Plaintiff proceeded to download and run AnyDesk on his computer.  Unbeknownst to Plaintiff, AnyDesk is a remote desktop connection program that allowed the criminals to control Plaintiff's computer and view his monitor as he navigated through personal files and input the passwords needed to access his virtual accounts.

107.    With AnyDesk running, Plaintiff proceeded to view the private key information associated with his Genesis account so he could provide the last four characters to Serrano via AnyDesk.    To view that private key information, Plaintiff repeatedly entered the password associated with his Bitcoin Core Client account.  As he did so, the criminals viewed that password.

108.    As a result, nearly nine hours after Plaintiff's initial call with Chetal, the criminals gained unfettered access to Plaintiff's Bitcoin Core Client account, which held a vast quantity of cryptocurrency assets totaling 4,138.64285467 Bitcoin.  In the 90-day period following the theft, the highest intermediate value of Bitcoin was $91,064.37, on November 16, 2024,[120] meaning that the damages suffered from the stolen 4,138 Bitcoin are approximately $375 million (4,138.64*91,064.37).[121]

109.    Lam immediately obtained the entirety of those assets.  The criminals also cleared Plaintiff's Google account to eliminate as much of the electronic trail of their activity as possible.

### CLAIMS FOR RELIEF

### COUNT I
#### *Breach of Contract (Third-Party Beneficiary)*

110.    Plaintiff incorporates the allegations in paragraphs 1-109 above as if fully set forth in this paragraph.

111.    Under the Engagement Agreement, which the Bankruptcy Court adopted in its Appointment Order (subject to specified modifications), Kroll agreed "to keep confidential all non-public records, systems, procedures, software and other information received from [Genesis] in connection with the Services provided hereunder."  Further, the Section 156(c) Application in support of Kroll's appointment as claims and noticing agent specified that Kroll would, among

---

[120]    Bitcoin   USD   Price   (BTC-USD),   *Yahoo!*,   https://finance.yahoo.com/quote/BTC-USD/history/?period1=1615574185&period2=1773336982.
[121] *Id.*

other things, "implement necessary security measures to ensure the completeness and integrity of the Claims Registers and the safekeeping of the original claims."

112.    Kroll's contractual obligations to keep confidential the sensitive information it handled in connection with the Genesis Bankruptcy Proceedings were intentionally included in the Engagement Agreement for the direct benefit of Plaintiff and other Genesis creditors.  The benefits of the collection and protection of Plaintiff's information—essential to Kroll's role as the claims and noticing agent for the Genesis Bankruptcy Proceedings—were thus among the direct and primary objectives of the contracting parties, such that Plaintiff is an intended third-party beneficiary of the Engagement Agreement.

113.    As a third-party beneficiary of the Engagement Agreement, Plaintiff is entitled to enforce that contract.

114.    In exchange for Kroll's provision of claims and noticing services, along with its obligation to maintain the confidentiality of information relating to Genesis creditors, Genesis provided Kroll with creditors' information and paid Kroll for those services.  Among the information provided was sensitive personal and financial information relating to Plaintiff that Genesis had maintained in its records, including Plaintiff's name and address as well as the types and amounts of cryptocurrency assets that were the subject of Plaintiff's bankruptcy claim.

115.    Genesis fully performed its obligations under the Engagement Agreement.

116.    Kroll materially breached the Engagement Agreement by failing to implement and maintain adequate systems, procedures, and practices to protect Plaintiff's highly sensitive confidential information, which allowed the Kroll Data Breach to occur, and thus failed to fulfill its express obligation to keep confidential the non-public information it received from Genesis, including information pertaining to Plaintiff.

-41-

117.    Kroll has failed and refused to cure its breach of the Engagement Agreement.

118.    Plaintiff, as a third-party beneficiary, did not get the full value of Kroll's services under the Engagement Agreement.

119.    As a direct and proximate result of Kroll's breach of the Engagement Agreement, Plaintiff suffered damages, including the loss of hundreds of millions of dollars' worth of cryptocurrency.

## COUNT II
### *Negligence*

120.    Plaintiff incorporates the allegations in paragraphs 1-109 above as if fully set forth in this paragraph.

121.    In connection with Kroll's appointment as claims and noticing agent for the Genesis Bankruptcy Proceedings, Genesis provided Kroll with Plaintiff's non-public, highly sensitive personal and financial information that Genesis had maintained in its records, including Plaintiff's name and address as well as the types and amounts of the cryptocurrency assets that were the subject of Plaintiff's bankruptcy claim.  Kroll had access to and used Plaintiff's personal and financial information to administer Plaintiff's claim and perform related services.

122.    Kroll had a non-delegable duty to maintain reasonable systems, procedures, and practices to ensure the protection of Plaintiff's personal and financial information.

123.    Kroll owed a duty to Plaintiff to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's personal and financial information within its control from being compromised, lost, stolen, accessed, or misused by unauthorized persons.

124.    Kroll owed a duty of care to Plaintiff to provide security, consistent with industry standards, to ensure that the systems, procedures, and practices Kroll utilized adequately protected this information.

125.    Kroll's duty to use reasonable security measures arose from the special relationship that existed between Kroll and Plaintiff.  The special relationship arose because Plaintiff and other Genesis creditors entrusted Kroll with their personal and financial information as part of the Genesis Bankruptcy Proceedings.  Only Kroll was in a position to ensure that it had sufficient safeguards to protect against the harm to Plaintiff that would result from a data breach.

126.    Kroll's duty to use reasonable care in protecting Plaintiff's information arose because Plaintiff was the foreseeable and probable victim of any inadequate security-related systems, procedures, or practices.  By collecting and maintaining the personal information of Plaintiff and acknowledging this information needed to be kept secure, it was foreseeable to Kroll that Plaintiff would be harmed in the future if Kroll did not protect this information from threat actors.

127.    Kroll knew or should have known of the risks inherent in collecting and storing Plaintiff's personal information; the vulnerabilities of its systems, procedures, and practices related to storing and using Plaintiff's data; and the importance of adequate data security.

128.    Kroll knew or should have known that its systems, procedures, and practices relating to the storage and use of information obtained from Genesis in connection with the Genesis Bankruptcy Proceedings were vulnerable to unauthorized access and exfiltration by third parties.

129.    Kroll breached its common law duties to Plaintiff—and thus was negligent—in numerous ways, including by:

(a)    Failing to implement and maintain reasonable security systems, procedures, and practices to protect Plaintiff's data from unauthorized access and disclosure;

(b)    Failing to adequately monitor, evaluate, and ensure the security of Kroll's systems and networks; and

(c)    Failing to reasonably inform Plaintiff after the Kroll Data Breach about the exposure of his data or to provide adequate guidance or assistance to Plaintiff to protect against future harm as a result of the data breach.

130.    Plaintiff's personal and financial information would not have been compromised but for Kroll's wrongful and negligent breach of its duties.

131.    Kroll's failure to take reasonable security measures to protect Plaintiff's sensitive information created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access and subsequent exploitation of Plaintiff's information through the Kroll Data Breach and the ensuing Social Engineering Attack.

132.    Plaintiff did not contribute to the Kroll Data Breach and subsequent theft of his cryptocurrency assets.

133.    As a direct and proximate result of Kroll's conduct, Plaintiff suffered damages, including the loss of hundreds of millions of dollars' worth of cryptocurrency.

## COUNT III
### *Gross Negligence*

134.    Plaintiff incorporates the allegations in paragraphs 1-109 and 121-33 above as if fully set forth in this paragraph.

135.    In its capacity as claims and noticing agent for the Genesis Bankruptcy Proceedings, Kroll knew it was protecting highly sensitive non-public personal and financial information about Plaintiff.  Further, particularly given Kroll's purported expertise regarding data security and cyber-threats, as well as its specific knowledge of (i) SIM swap attacks that posed a direct and immediate danger to Plaintiff and other bankruptcy creditors and (ii) the risks identified

-44-

in the Bankruptcy Court's Order granting the Sealing Motion, Kroll knew or should have known that failing to take reasonable measures to safeguard Plaintiff's personal and financial information would expose Plaintiff to potentially devastating harm.

136.    Kroll's failure to keep this information safe was grossly negligent, as Kroll was aware of the severe consequences of not keeping the information secure.  Kroll's blatant failure to implement and maintain adequate systems, procedures, and practices relating to the storage and use of Plaintiff's highly sensitive personal and financial information evinced a reckless disregard for Plaintiff's rights.

137.    As a direct and proximate result of Kroll's grossly negligent conduct, Plaintiff suffered damages, including the loss of hundreds of millions of dollars' worth of cryptocurrency.

## COUNT IV
### *Breach of Fiduciary Duty*

138.    Plaintiff incorporates the allegations in paragraphs 1-109 above as if fully set forth in this paragraph.

139.    Kroll served as a fiduciary in its capacity as claims and noticing agent for the Genesis Bankruptcy Proceedings.  Because Kroll's power to allow or disallow claims and to direct payment by the Genesis debtors was for the benefit of bankruptcy creditors, including Plaintiff, Kroll undertook a fiduciary duty in exercising that authority.

140.    As a result of that fiduciary relationship, Kroll had a fiduciary obligation to act for Plaintiff's benefit in matters within the scope of its relationship as Genesis's claims and noticing agent.  Those matters included the security of Genesis bankruptcy claimants' personal and financial information.

141.    Kroll breached its duty as a fiduciary by (a) failing to implement and maintain reasonable systems, procedures, and practices to protect Plaintiff's information from unauthorized

access and disclosure; (b) failing to adequately monitor, evaluate, and ensure the security of Kroll's systems and networks; and (c) failing to reasonably inform Plaintiff after the Kroll Data Breach about the exposure of his information or to provide adequate guidance or assistance to Plaintiff to protect against future personal or financial harm as a result of the data breach.

142.    As a direct and proximate result of Kroll's conduct, Plaintiff suffered damages, including the loss of hundreds of millions of dollars' worth of cryptocurrency.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

(a)    Declaring and determining that Kroll breached the Engagement Agreement, was negligent and grossly negligent, and breached its fiduciary duty by reason of the acts and omissions alleged in this Complaint;

(b)    Awarding Plaintiff compensatory damages for all damages sustained as a result of Kroll's wrongdoing, in an amount to be proven at trial, including prejudgment interest;

(c)    Awarding Plaintiff his reasonable costs and expenses incurred in connection with this action, including attorneys' fees and costs; and

(d)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: March 23, 2026

*/s/ Jason L. Lichtman*

Jason L. Lichtman
Michael J. Miarmi
Sean A. Petterson

-46-

**LIEFF CABRASER HEIMANN
 & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Email: jlichtman@lchb.com
        mmiarmi@lchb.com
        spetterson@lchb.com

Annie M. Wanless (*pro hac vice* forthcoming)
**LIEFF CABRASER HEIMANN
 & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Email: awanless@lchb.com

*Counsel for Plaintiff*

-47-